No. 172165, No. 172166, and No. 172167 PIA Investments LLC v. Financial Oversight and Management Board Good morning, Your Honor. Eric Brunstad on behalf of Paaje Investments LLC. Four key points I'll summarize really quickly and I'd like to get to. The first is that Paaje holds a lien on the total revenues. The second point is that HTA and the Commonwealth are treating Paaje as an unsecured creditor in violation of the Fifth Amendment. The third point is that they are not providing Paaje with adequate protection, which mandatorily entitles Paaje to relief from staying. And the fourth point is that we are entitled to adjunctive relief either to remedy the Fifth Amendment violation or simply to enforce Section 922A. And I forgot at the outset, Your Honor, if I may reserve five minutes for rebuttal. Yes. Thank you, Your Honor. I apologize. On the adequate protection point, there are really kind of two key sub-points. Adequate protection means one of two things. The first thing that it means, consistent with the Fifth Amendment on which it is based, is that you cannot take all of the secured creditors collateral, every penny leaving them unsecured. The second point is that they're not taking all of it, but they're only taking part of it. They have to prove, it's their burden under Section 362G, to prove that what remains is sufficient to cover the debt. In this case, they are taking all of it. If you look at the Joint Appendix A-146, you see their fiscal plan. They propose for the next ten years to take all of the total revenues, about $100 million a year, and spend all of it. Now, why are they doing that? If you go through the fiscal plan, you'll see that they have lots of income. They have tax revenues, excise tax revenues. They're collecting all of that, and they're shipping that off to the Commonwealth. And so then they say, well, we have to take the $100 million, your total revenues, if you have a lien on, and use that for our operations. Well, they can't do that consistent with the Fifth Amendment. They can't do that consistent with adequate protection. And more importantly, they don't even need the $100 million to operate. The bankruptcy judge, Judge Swain, the district court judge, will have said, we're not going to be protected because they're using at least some of your total revenues to maintain the roads. That is patently not adequate protection. Adequate protection looks to protect the interest of the creditor, not the interest of the collateral. The Third Circuit made that plain in Sweden. How does time layer over adequate protection? In other words, you know, this is not, the ten-year limit has been mentioned, but is it okay for them to take it for two years and give you nothing? Is it okay for them, you know, where is the time, how does time layer over it? That's a great question, Judge Torsen. And I think to answer it completely, we have to go back to, again, the Fifth Amendment premise behind adequate protection. And what most informs that is actually the Supreme Court's 2015 decision in Horn. There you had, every year, the growth of growing raisins. And every year, the government was coming in and taking some of those raisins, and basically taking them and saying, you can't have these, you can't sell these. And the question is, you know, then the government tried to say, that's not really a taking. And the government tried to say, it's kind of a renewal thing, we'll get more later. Or also, we will sell some of yours and give you some of the proceeds later. But the Supreme Court said emphatically, they can't do that under the Fifth Amendment without giving just compensation. It's an actual taking, it's not a regulatory taking, it's a taking, which is what we have here. And they have to show it's completely compensatory. So here's the answer to your honest question very specifically. And that explains why it has to be completely compensatory for what's being taken. They have to show that if they're taking $100 million now this year, as they did last year, as they're going to do this year, as they plan to take continuously, that what remains is going to be enough to pay the $833 million that's owed to the 16 bondholders in full. Because as they conceived, the bondholders were oversecured. As of the petition date, there was enough value there to pay the 68 bondholders in full. But if they take $100 million a year, year after year after year, what's left? Our experts said, what's left is not enough. It's not enough when you take into account the fact that revenues are declining, when you take into account the risks that are associated, when you take into account that you have to discount a little over 20. These bonds are amortized over 20 to 30 years. If you delay payment, is what's remaining going to be enough to pay you in full? Our experts said no. They did not put out any expert testimony, any witness at all, to value the stream and say that we won't be harmed. They didn't put failure proof on their side. How would this work? Let's say there's special revenues, and let's say you don't have a statutory lien. So you're proceeding with an ordinary lien under 928B, I think it is. And the Commonwealth simply, by order or tax or otherwise, imposes an expense on the highway authority that equals everything that is now going to the Commonwealth, leaving them only with just enough money to run the roads. Why wouldn't that expense be considered a necessary operating expense, and you'd be left with nothing, net of that? Here's how it works. We only argue. The statutory lien issue is only relevant to the surcharge question. Can they take the expenses and put them ahead of our expectation? And I'm asking you to assume you don't have a statutory lien. Explain how this would work for us. Sure. Our lien arose before 922, 928 could be imposed. We say under the Constitution they can't retroactively convert over gross lien. Currently we have a gross lien. We get paid first before expenses. Then why convert that into a net lien? Whether they charge the expenses against us. They have to prove that the expenses they want to put ahead of us are necessary operating expenses to preserve the project. That's Jefferson County. To preserve our three roads, PR-23, PR-50, and PR-53. 52 and 53. They didn't even try to show that below. They simply said, we don't have to bother with that. We can just simply surcharge all the operating expenses of the entire enterprise against you. Tread the bottom of the train system, bridge repair, pothole repair, sidewalk repair, all of that. And that doesn't work under the bankruptcy code. That's not bankruptcy law. Again, you're treating us as an unsecured creditor. Can I ask a question about the money here? You're talking about $833 million in debt. For the people you represent, how much is that? We're the largest uninsured holder of $65 million. So does that mean you bought $65 million worth of bonds in 1968? Yes. 68 bonds. And I take it they've been paying you back. The 68 bonds were not issued in 68. That's simply their normal culture. So how much do they owe you today? Roughly $65 million. But the total amount of debt that's been fixed is $833 million. But you seem to be sort of bringing the broader claim for everybody. Well, I'm doing it for the adequate protection analysis, because that's how we have to do it. You get to lump in somebody else to decide whether you are adequately protected? Because we all have the lien. We all share the lien. But you're here and they're not. I'm sorry? You're here and they're not. Well, they are here. They filed a complaint in the proceeding below. Their complaint was dismissed. So you represent everybody. I don't claim to represent everybody, but I do claim that this is how we properly analyze the legal issues. It redounds to our benefit and we are advocating them. And under the Enabling Act, under Section 2013, we're entitled to individually assert these rights. There's no adventure trustee. There's no single party to assert them on our behalf. How do you mean to get rid of them? This is critical. Again, the statutory lien issue is only relevant to surcharge. We argued our complaint. We argued our motion. And I argued below that we have a lien. We have a lien on the total revenues. The only reason why the statutory lien issue is relevant, Judge Swain asked me at the June 5th hearing, they said they can surcharge you. And I said they can't because of constitutional reasons. Our lien predates the ability for them to try to convert with protection under the Fifth Amendment. And we have a statutory lien. That's consistent with what we advocated entirely in our complaint. We say first, in paragraphs 5 and 35 and 2, we have a lien. And then we explain in our complaint, in paragraphs 78 through 81 and 10, that in response to the argument that they could surcharge us, that we have a statutory lien. The same thing in our motion. We say on page 4, this is page 191 of the appendix, we have a lien. And then we explain in response to the surcharge argument that we have a statutory lien on page 205 through 206 of the appendix. At the June 5th hearing, Judge Swain asked me, they say that they can surcharge you. I said they can't surcharge us because we have a statutory lien. But I was very, very clear to state, and it's on the letter, on page A259 in the appendix, we don't say that we have a statutory lien or nothing. We say we have a lien. And our lien is clearly established. What would you do with this lien if you were granted relief from stay? We already have a pending action in front of Judge Busosa. The statute in the Enabling Act gives us a remedy. It's remedy of mandamus under Section 213. We would ask Judge Busosa, since they are on default, to pay us the total revenues as is supposed to. Now, there's no way to accelerate that. We can't claim the entire $833 million is due. We've only got past due, principal, and interest. That's how it works periodically. Now, what we said to them, though, is we don't think that for adequate protection purposes, we have to have the entire $100 million of total revenues. We think we only need about $70 or so million of those revenues if you put those aside for us now to adequately protect us. That's enough to keep us oversecured with an equity cushion. You can have $25 million to operate the roads. You can have $25 million to operate the roads. It might happen in a minute, Your Honor. Yes. You can have $25 million to operate the roads. And we think that's sufficient to maintain the toll roads, which generate our collateral. Okay. They rejected that. And so now we have a situation in which they're just taking all of their collateral. But, again, this is the key point. They intend to continue doing that for 10 years. The fiscal plan says that point. They're taking all of their other money, their excise tax money, shipping it off to the Commonwealth. Isn't the bankruptcy likely? Judge Sweeney is anticipating the bankruptcy proceeding will end within two years. But they are bound by the fiscal plan. What does it mean? They do not have a plan of adjustment that is a departure from their fiscal plan. If this ends in a confirmed plan, wouldn't you be protected at that point? Only if there is enough collateral value then left to make us whole. Our experts said if they continue for these first two years to take 100 percent of the collateral, while the interest rises and the revenues decrease potentially, there's not going to be enough value for us to take. But wasn't the judge unpersuaded by your expert testimony on that? But it was their burden, Your Honor, to show that we would be protected. Now, under Section 922, our alternative route for injunctive relief, under Section 922, they're supposed to be turning over the toll revenues to us because, as the district judge found, those are plain special revenues. But isn't 305 and 306 a problem? Those are not, Your Honor, but I can answer Your Honor's question, and I will. Section 305 derives from Section 904 that applies in Chapter 9. Section 305 does not hamstring the authority of the district judge, as the district judge thought in a different case. As Judge Klein said, in the Stockton case, when a debtor voluntarily files for bankruptcy, they consent to have the bankruptcy law applicable to them. You cannot say, I'm going to file for bankruptcy, but oh, you have no power to enforce the bankruptcy law against me. Then what does 305 do? What work does it do? What 305 does is, for example, and Judge Klein again addressed this in the Stockton case, if you want some sort of relief that the Bankruptcy Code doesn't authorize, then, you know, I don't have the authority to do that because Section 305 interferes. There's another reason why Section 305 doesn't hamstring, and that is Section 305, again, is padded after Section 904. Section 904 was designed to prevent a constitutional problem, and the constitutional problem was that states under the 10th Amendment cannot basically have their municipalities subject to bankruptcy law without their consent. Puerto Rico is not a state. But in enacting PROMESA, isn't Congress basically saying, we want to treat them like a state for these purposes? That is, Congressional legislation in Puerto Rico as a territory does not have the same constitutional prohibition against interfering with its... I understand that, but, you know, Congress didn't have to do that because they didn't have a 10th Amendment problem, but they did it anyway. Correct you are, and they're free to do it, because Congress cannot authorize, consistent with the 10th Amendment, bankruptcy against the state, but it can against Puerto Rico as a territory. So Judge Klein got the analysis exactly right. Judge Swain got the analysis I submit exactly wrong. The same thing here on the test for a statutory lien. Judge Swain got the test exactly wrong. The correct test is the one adopted by the Third Circuit in Chick. Have you used up your time? Yes, Your Honor. Thank you very much. Good morning. May it please the Court. Jeffrey Levitin of Proskauer Rose for the appellees. This appeal presents a narrow question. Did PI sustain this burden of proof to obtain a preliminary injunction and stay relief? The appeal is not about whether PI's lien rights have been taken, because no lien rights can be affected until a plan of adjustment in a Title III case. Whatever entitlements they have, they will need to be respected in the plan of adjustment, or the Court will not confirm it. Do you know of a case on that, what you just said? No lien rights can be affected until the confirmation? I don't have a case that specifically says that, but a plan of reorganization is the only vehicle of plan of adjustment that modifies lien rights. The right of a secured creditor in the period from the filing date through the date of the plan of adjustment is a right to have its secured interest adequately protected, and that's what protects its Fifth Amendment rights during this interim period. An appeal is not about whether PI will get paid in the future. That also will be resolved in the plan of adjustment. The narrowest issue is whether PI is entitled to receive debt payments today before the Title III case has run its course. And the District Court correctly said no, because PI has not shown a likelihood of success on its claims, or that it would be irreparably harmed absent a preliminary injunction, and because PI is adequately protected. These findings were correct and are not an abuse of discretion in any event, and therefore the decision below should be affirmed. I want to make three points. First, PI did not establish that it had a lien on HTA's total revenues on the basis they moved on, and therefore can't succeed on the merits of any of their claims. Second, PI failed to establish irreparable harm, which is an independent ground for denying a preliminary injunction. And third, even if PI had a lien on HTA's total revenues, the District Court took evidence and determined that any lien would be adequately protected during the Title III case, and there is no basis to overturn the District Court's factual findings in that regard. So in order to get relief, PI's first burden was to show that it had a lien on HTA's total revenues. Without a lien, all its claims have to fail. Its takings claim can't prevail if there is no lien to be taken. Its claim that revenues have to be turned over fails because if it has no lien, it has no interest in those revenues. And its claim for stay relief can't prevail because only a secured creditor is entitled to adequate protection. So without a lien, PI has no likelihood of success on their merits. So first I'll explain why PI has not demonstrated that it has a statutory lien and then turn to the Court's decision to preclude evidence of a consensual lien for purposes of the motion before it. Let me start with the statutory lien argument. A statutory lien arises automatically, and the world is on notice of the existence of the lien by force of the statute. In contrast, a security interest or consensual lien is created by agreement among private parties, and the world is on notice of its existence through a public UCC filing. There are two different systems for the creation of perfection in liens. Now Bankruptcy Code section 101, which is incorporated into PROMISA by section 301, defines a statutory lien as a lien arising solely by force of statute, unspecified circumstances or conditions. Do you contest that they have some lien, if not statutory? We believe that their lien is limited to the amount of funds that were held by the fiscal agent on the filing date. The language of the resolution only grants a lien on the monies actually held. And would you say that's the same for basically any municipal revenue bond, or that the lien is limited to what's in a dedicated account, and everything else is just contract? Well, this particular contract specifically limits the lien to the monies held by the fiscal agent. Section 601 of the bond resolution, which is in the addendum at page 44, provides that revenues are pledged, quote, to the extent here and above particularly specified. And the provisions above only relate to monies held by the fiscal agent. And so the code in other cases periodically referred to special revenues as a property interest of the bondholder. So is that correct? Should we regard the revenues that are supposed to go to the bondholders, those being special revenues, as a property interest of the bondholders?  But the bankruptcy definition doesn't seem to limit the definition of special revenues to revenues that are subject to a lien. Well, special revenues are treated specifically by the statute. But only an entity that has an interest in those revenues would be able to enforce those provisions. Are you going for the whole hog here? Because it seems to me like what I read suggests that you pledged your revenues stream. The contract certainly said that provides that the revenues were pledged. If we have to have a proceeding to determine exactly what the scope of that alleged lien is, we would argue under the terms of this resolution, which is the contract, the lien is limited to the amount of funds in the account. And then how could you do the balancing of either for an injunction or for a relief from stay without knowing which is which, whether you're right or not? Because essentially you're talking about a world in which there's some protection for essentially nothing or there's some protection for $100 million in revenue stream. For the adequate protection argument, which is the Fifth Amendment protection during this interim period, the court assumed without deciding that Piaget and the other bondholders held a lien on the revenues and determined that because the toll revenues were being used to maintain the roads and the transportation system, which ensured the generation of revenues in the future, that that provided adequate protection to them. But you're not willing to concede that at this point? No, you're not. So HTA's authority, turning back to the statutory lien point, HTA's authority is governed by PR Act 74-1965, which we refer to as the HTA Enabling Act. Now, both parties agree that the Enabling Act does not give rise to a lien. There's no mandatory lien-creating language in the statute. Instead, it merely authorizes HTA to issue bonds and to pledge its revenue if it so chooses. It says that a resolution authorizing bonds by HTA may convey provisions pledging revenues. It does not create a lien. It gives HTA permission to create a lien. Now, Piaget relies on that part of the Bankruptcy Code definition of statutory lien that includes a lien arising on specified circumstances or conditions. And Piaget argues that the specified conditions here are HTA decides to sell bonds. But that's not what the definition of a statutory lien means when it talks about a lien arising by force of statute upon certain conditions. Such a lien arises if the statute says if X occurs, then a lien exists. The statute here doesn't say that. It merely gives HTA the option to pledge revenues if it so chooses. So any lien arises as a result of HTA's deciding to pledge its revenues, not by the statute. And Piaget's own cases prove that point. Did you think there were only... What motive would the bondholders have to have asserted exclusively a statutory lien and to have not simultaneously been saying we have some lien we think is statutory? They would have had to face two issues if they had pledged a consensual lien. First... But pleaded in the alternative. If they pleaded in the alternative. Position A, we get a statutory lien, we're sure. But, Judge, why conceivably would they not have said, but, Judge, if you reject that argument, I'll fall back position as we do have a lien. They didn't want to be subject to 928B. If they pled a consensual lien, then by virtue of 928, even though they claim they had a gross pledge, it would be subject to the expenses of operating the transportation system. So you're saying they'd rather have no lien than a non-statutory lien? No, they were going for broke. They were going for, we want to control... They're like your mom for broke, right? You have fallback. Should we therefore say that because you're going for broke, saying they had no lien except in the statutory fund, that you've waived any argument that... I don't think so. So tell me why you think they're going for broke in and of itself meant they didn't have a fallback position to going for broke as opposed to zip. They proceeded exclusively on the basis of a statutory lien. They were going for broke. They tried to change course and plead an alternative in their reply brief for the first time. And that was improper. That would have been prejudicial to us. And the court below properly struck any argument of the consensual lien for purposes of this motion only. They were free to come back to her and argue in the alternative for a consensual lien. How would the arguments have been any different on either the preliminary injunction or the relief from stay motion had they been predicated on there being a non-statutory lien? Would that have affected the merits of either one of those issues? Yes, it would have, Your Honor. We would have argued that the amount of the expenses exceeded the total revenues so that they weren't entitled to any payments to be adequately protected. We also would have raised an issue about the infirmity of the perfection of a consensual lien. We believe that their UCC1 financing statement had an improper name on it which results in that lien being unperfected. And so we would have litigated those two issues and we will litigate those two issues if they do choose to raise the consensual point. Is there any law in bankruptcy on how when you have special revenues under when a bond pledges revenues, the bond issuer pledges revenues, what the rights are of the bondholders vis-à-vis third parties who receive those revenues without the permission of the bondholder? Does the UCC filing put notice to third parties that they can't take any money from the municipality, for example? I'm not aware of any particular case that addresses the effect of a security interest in bond revenues. Because if it did, then you'd be hard-pressed to say there wasn't a security interest there. Yes, if there was a case, but again, we don't believe that the lien here by... Are there cases addressing, the briefs really don't help us on this either way, on how that works, and maybe there are no municipal cases. There are very few municipal cases, and I'm not aware of any case that specifically addresses that issue. Now, it's important to emphasize that the bonds were held, were issued by a public corporation pursuant to a resolution. Now, PI recognizes that the bonds were issued by a resolution and argue that it's not really a resolution, it's a regulation. But it's not a regulation. For a regulation to be enacted under Puerto Rico law, there needs to be certain administrative procedures that need to be followed. There needs to be publication. There needs to be a period of public notice, none of which was followed here. And these procedures are not just technicalities. They serve an important public purpose. Now, just turning quickly to the consensual lien argument, it was properly weighed because it was the first time it was pled in reply. PI does point to one statement that they made at the June 5th hearing, and that has to be balanced against the five or six other specific statements where they specifically disclaimed any interest in a consensual lien. Now, turning quickly to the irreparable harm argument, the court below heard evidence on irreparable harm, which was the deterioration of the equity cushion. That was the only irreparable harm that PI had pled. The court heard evidence of Mr. Stanford and found that evidence not credible. So they failed to establish their burden of establishing irreparable harm. The court also took evidence of adequate protection, found that use of the total revenues to maintain the roads to ensure revenues in the future was adequate protection, and we cited a number of cases in our brief. It's well established that that is a form of adequate protection. Thank you. Judge Torreson, to your point, it's plain that we cannot simply have to wait for the plan of reorganization. The whole point of adequate protection is to give us interim relief. That's the whole point. It's based on the Fifth Amendment. They can't be diminishing your collateral position while we wait for reorganization. In the Penn Central case, it took 11 years to get to a reorganization plan. Who knows how long it could take here? On the point about Judge Kayada pleading in the alternative, counsel said we didn't somehow say to our reply that we pled a lien of some kind other than a statutory lien. Long before that, in the joint pretrial statement that the parties filed jointly on June 22, 2017, quote, this is the issue the parties identified jointly, quote, whether Kayada has a valid enforceable first priority lien on the total revenues as a matter of Puerto Rico law, comma, and whether such lien is a statutory lien or a non-statutory lien for purposes of the bankruptcy code. If you were presenting a non-statutory lien, then you would have been looking at a scenario under 928B, not A. And did your expert analysis therefore net out operating costs, which would be consistent with pursuing a non-statutory lien? The briefs weren't clear on it, but as best I could tell, you were more of a 928A type analysis. Yes. We say that these are planned special revenues. The court will agree with us. That's a fine. We say 922A says they have to turn over the planned special revenues to us. And then you did your analysis of the non-protection, the inadequate protection collateral, based on that gross number. We assumed that if they paid us all the total revenues now and didn't deduct anything, that we would be oversecured if we got the money now. But if they don't pay us anything, we're undersecured. And if they deduct as much as $20, $30 million a year, our equity cushion erodes rapidly. We go into unsecured status. We are harmed. We go from being oversecured to unsecured, undersecured, and that's the harm. They did not put on any evidence to report that. They had no witnesses whatsoever. But just to clarify, if we have a lien, again, the surcharge also doesn't apply. Because we argue that the surcharge doesn't apply for three reasons. One, because we have a statutory lien, and we think the court will apply the one test. Two, because our lien predated the enactment of PROMISA, and it was only because of PROMISA that they have statutory authority to surcharge the lien. But then we say that violates the Fifth Amendment. That's taking our collateral. And the Supreme Court addressed this very same issue in the Security Industrial, where the Supreme Court said, well, 522 came along in 1980. And Section 522 said that judicial liens are just aggravated. And the Supreme Court said, well, under the Fifth Amendment, we can't interpret that to apply retrospectively to liens that are already in place. So we must interpret that to apply only prospectively to avoid a problem with the Fifth Amendment. We say the same thing. 928 was not available to do this, convert our gross lien to a net lien, until long after our lien was in place. So for constitutional reasons, it doesn't matter whether we have a statutory lien or a security interest. And I should note on terminology, the Code does not use the term consensual lien. It uses the term statutory lien, security interest, and judicial lien, all the subspecies of the term lien. We clearly have a lien in the meaning of the definition of a lien under Section 101. We think it's properly a statutory lien. But the way the Code's nomenclature works, if it's not a statutory lien, it is necessarily, by default, a security interest, because that is that they're mutually exclusive. We have one or the other. All can see it's not a judicial lien. Now, here's why Judge Swain got the test wrong for statutory lien. She said everything has to be within a formal statute in order for it to be a lien. The Third Circuit, in check, rejected exactly that analysis. But there's a big difference between an agency doing something and a public corporation. When you have a public corporation, it seems like it's just like another corporation. You've authorized it to do something, and then its board does the resolutions and authorization to allow management to issue the debt instruments. There's no problem with the administrative agency issue. It wasn't raised below. And it doesn't apply here because the Enable Act itself says specifically that HTA has authority to do this by regulation. A charter for a private corporation would also grant it authority to issue debts. That doesn't make it a statutory lien. Under Section 2012, it validates. But one thing I would like to add, if I may, and that is that they are completely wrong on our claim regarding a lien. We do not claim that our lien is based on Section 402, just the funds in the hands of the fiscal agent. Section 601 of the 68th Resolution says very clearly and very plainly we have a lien on the toll revenues itself. It says that. And throughout the HTA, the 68th Resolution, it refers to us as a lien over and over again, Section 601, Section 602, Section 605. And it's just not true that the HTA simply had the ability to determine whether or not under Section 2015. But can you help me with that? Does that mean that if they paid a contractor to come pave the road and they used some of those funds that the document says is a lien, that you could go against that contractor and recover the money back? And if you can't, how is it a lien? Yeah. So it is a lien. Okay. So could you go after the contractor? Had it taught secure transactions for 30 years, I can say anecdotally, yes, it is that kind of a property. Give me a case because the briefs don't. You would have tried to go after it. Correct, Your Honor. We would not try to go after the contractor who's got the proceeds of our lien. What we want is the stream of revenues that HTA is collecting. Could you give a case that would show that some bondholder, a revenue stream of gross revenues, has a lien in the sense that it protects them from third parties such that in that example I gave they could go after a third party? I have an even better source for you, Your Honor. It's the statute. The resolution, Section 602, says we have priority and we're entitled to be perfected and nobody else can have a claim equal to or superior to ours. Plus, Your Honor, here's the point about Article 9. That doesn't speak to some past money that was paid. No, but here's the point about Article 9 and proceeds. Puerto Rico enacted Article 9 in 1996. It enacted revised Article 9 in 2013. Article 9 supplements the provisions of the Enabling Act and the 68 Resolution. It does that under 9102C as we explain in our brief. Article 9 clearly provides that when you have a lien, as we do here, it extends to proceeds. That's clearly provided in the statute. And the cases are legion that you can go after the proceeds in the hands of third parties. That's why I explained carefully below that there's complications between the Enabling Act and the 68 Resolution and Article 9. But 9109C clearly provides that Article 9 provides to the extent there's any deficiency in the Enabling Act or the 68 Resolution with respect to our lien rights. So accordingly, we do have rights in the proceeds. We do have rights against third-party transference of those rights. Article 9, however, supplies a complicated set of procedures for when those rights are cut off. For example, with respect to accounts. We're not going to get a chance to go into those. So we will take it under advisement. We are acutely aware of our obligation to decide as expeditiously as possible. We'll do our best. Thank you, Your Honor. Thank you.